EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

CONSOLIDATED SERVICES SYSTEMS, Defendant.

No. 85 C 8312.

United States District Court, N.D. Illinois, E.D.

Sept. 4, 1991.

600

Zachary Alan Tobin, Jason Stephen Hegy, John P. Rowe, U.S. E.E.O.C., Chicago, Ill., for plaintiff.

Marvin F. Metge, Bruce Craig Spitzer, Gorham, Metge, Bowman & Hourigan, Cary K. Kabumoto, Kabumoto & Malany, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

The plaintiff, the United States Equal Employment Opportunity Commission ("EEOC") brought this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). The EEOC claims that the defendant, Consolidated Service Systems ("Consolidated") engaged in a continuing pattern and practice of illegally discriminating against non-Koreans as a class in both the recruitment and hiring of persons to perform janitorial services at various buildings throughout Cook County and the Chicagoland area. Jurisdiction is proper. The trial issues of liability and damages were bifurcated. A bench trial was held.

Having carefully considered the evidence, the court finds that the EEOC failed to sustain its burden of proving by a preponderance of the credible evidence that the defendant illegally discriminated against non-Koreans in recruitment and hiring during the time period alleged. Consequently, judgment will be entered in favor of the defendant Consolidated and against the plaintiff EEOC.

## I. BACKGROUND FACTS

Consolidated is a company which supplies janitorial services to other companies and businesses. (Tr. 29.) The time period covered by the EEOC's lawsuit is January of 1983 through March of 1987. It is undisputed that during that four and a quarter year time frame Consolidated's work force was primarily Korean.[1]

---

1. According to plaintiff's expert a person is "Korean" as the term is used by plaintiff when the person or person's ancestors were born in Korea and the person would identify himself as Korean in the Census. (Tr. 57–58.) The court for purposes of this opinion has used plaintiff's definition of "Korean".

There was no set procedure at Consolidated for persons seeking employment to fill out applications. (Tr. 31.) There were no written criteria or written rules as to the level of education needed to be hired as a janitor at Consolidated. There was no written rule or standard rule as to level of experience needed to be a cleaner at Consolidated. (Tr. 30.) Persons hired as janitors and cleaners at Consolidated, however, were interviewed by Andrew Hwang, Consolidated's president commencing January 1983, or by other Consolidated personnel. (Tr. 32–33.)

Mr. Hwang, who was born in Korea, attended high school and two years of college in Korea. (Tr. 26.) He became president of Consolidated January 1, 1983 when he purchased the company from its previous owner who was also a Korean. (Tr. 28.) Before Mr. Hwang's purchase of Consolidated, the cleaning performed by Consolidated was performed by Korean individuals who were considered to be subcontractors rather than employees of Consolidated. Mr. Hwang, in January 1983 upon acquiring Consolidated, employed the persons who previously had performed Consolidated's cleaning tasks as independent contractors.

During the year 1983 Mr. Hwang hired three people who had not previously been performing the same work as independent contractors for Consolidated under the prior ownership. (Tr. 723.) One of those people was a Charlene Burris, Mr. Hwang's secretary, a non-Korean. Another person Mr. Hwang hired was Korean, Soon Park. Mr. Hwang's wife was also employed. Her nationality was not proven but the court assumes she is Korean.

During the period which the EEOC claims Consolidated discriminated against non-Koreans, 1983–1987, only two Consolidated employees, other than Mr. Hwang (Tr. 744.), worked more than five hours per day. (Tr. 728.) One of those two workers was "inherited" from the previous owner. One was hired by Mr. Hwang. That one worker who Mr. Hwang hired, Mr. William Wall, was a non-Korean. (Tr. 728.) Most of Consolidated's cleaners who worked five hours per day less in the Cook County area earned $5.00 per hour or less (Tr. 728–731.) with no fringe benefits. (Tr. 748.)

During the period 1983–1987 Consolidated obtained a government cleaning contract in Las Vegas. That contract began May 1, 1986. Consolidated hired nine people, all non-Koreans, as its cleaning work force for the job. (Tr. 733–736.) They were paid $8.00 per hour. The thirteen people hired for the Railroad Retirement building at 844 North Rush in Chicago when Consolidated first got that contract in March 1984 were Korean. (Tr. 749–51.) They earned between $8.59 to $8.65 per hour. (Tr. 749.)

Mr. Hwang never recruited employees in the sense of going out and hiring people. (Tr. 43.) A lot of people at Mr. Hwang's church came up to him and asked him if he had jobs. He hired only a few. (Tr. 40–41.) The Korean Association of Greater Chicago (who is not a party to this action) sent Mr. Hwang applicants. (Tr. 41–43.) Only a couple times did Mr. Hwang ask people who worked for him if they knew people who needed jobs. (Tr. 40.)

During the period between January 1, 1983 and June 30, 1987, Consolidated placed an employment advertisement in a Korean language newspaper, the *Joon Ang Times*, only once. (Tr. 732.) That ad first appeared on February 17, 1984 and ran for three days. (Tr. 732.) Consolidated hired no one as result of that Korean language ad. (Tr. 733.) In March of 1985, Consolidated advertised for employees in the *Chicago Tribune* (Pl.Ex. 140.), a newspaper of general circulation in the Chicago area, but hired no one as a result of that advertisement either. (Tr. 737.) Consolidated also placed an advertisement in the *Chicago Tribune* in June of 1987. (Tr. 740.) Consolidated received "a lot of applicants" from that advertisement, but none of the applicants wanted the job. (Tr. 740.)

## II. DISCUSSION

### A. *Legal Standards*

█ Because the EEOC alleges a "pattern-or-practice" of discrimination by Consolidated (Pl.'s Trial Brief at 2.; Tr. 7.), the

EEOC has the burden of proving "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts" by Consolidated. *International Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977). Instead, the EEOC must establish "by a preponderance of the evidence that [the national origin] discrimination was [Consolidated's] standard operating procedure—the regular rather than the unusual practice." *Id.*

■ The EEOC sought to establish Consolidated's pattern and practice of discrimination under both the disparate treatment and disparate impact methodologies. (Tr. 8.) "Disparate treatment" is the more straight-forward method of proof. As the Supreme Court summarized in *Teamsters:*

"Disparate treatment" ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.

431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15 (citations omitted).

■ The "disparate impact" methodology is less direct, but often easier to utilize. The Court described this approach as follows:

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive, we have held, is not required under a disparate-impact theory.

431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15 (citations omitted); *see also Gilty v. Oak Park*, 919 F.2d 1247, 1254 (7th Cir.1990).

Thus, unlike disparate treatment claims, under the disparate impact methodology, a plaintiff need not prove discriminatory intent. Instead, a plaintiff must show that the policies and practices at issue "have a substantially disproportionate impact on the protected class." *Gilty*, 919 F.2d at 1254, *quoting Griffin v. Board of Regents*, 795 F.2d 1281, 1287 (7th Cir.1986).

■ Under Title VII the EEOC, as the plaintiff, has the initial burden of making out a prima facie case of discrimination. *Id.*, 431 U.S. at 335–6, 97 S.Ct. at 1854–5. To make out a prima facie case of discrimination a plaintiff in a pattern-or-practice case must demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer. *Id.*, 431 U.S. at 360, 97 S.Ct. at 1867. A plaintiff's prima facie case in a pattern-or-practice claim usually consists of statistical evidence demonstrating substantial disparities in the application of employment actions as to the minorities and the unprotected group, buttressed by evidence of general policies or specific instances of discrimination. *Coates v. Johnson & Johnson*, 756 F.2d 524, 532 (7th Cir.1985).

■ Once a plaintiff establishes a prima facie case of a pattern-or-practice of discrimination, the burden shifts to the defendant to produce evidence of a business justification for its employment practice. The burden of persuasion with respect to discrimination, however, remains with the disparate-impact plaintiff at all times. *Mozee v. American Commercial Marine Service Co.*, 940 F.2d 1036, 1049 (7th Cir. 1991); *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 2126, 104 L.Ed.2d 733 (1989). Moreover, the strength of the evidence the defendant must produce to prevent the plaintiff from carrying the burden of persuasion as to disparity depends, as in any case, on the strength of the plaintiff's proof. *Coates*, 756 F.2d at 532, *quoting Segar v. Smith*, 738 F.2d 1249, 1268 (D.C.Cir.1984). Indeed, a shoddy showing of disparate impact will not require a defendant even to produce evidence in justification of the challenged practice. *Allen v. Seidman*, 881 F.2d 375,

378 (7th Cir.1989), *citing Wards Cove,* 109 S.Ct. at 2121–24.

■ With regard to a defendant's business justification for the use of particular practices, this phase of a disparate-impact case contains two components: (1) a consideration of the justifications an employer offers for his use of the practices at issue; and (2) the availability of alternate practices to achieve the same business ends, with less racial impact. *Wards Cove,* 109 S.Ct. at 2125. The dispositive issue is whether a challenged practice:

> ... serves, in a significant way, the legitimate employment goals of the employer The touchstone of this inquiry is a reasoned review of the employer's justification for his use of the challenged practice. A mere insubstantial justification in this regard will not suffice, because such a low standard of review would permit discrimination to be practiced through the use of spurious, seemingly neutral employment practices. At the same time, though, there is no requirement that the challenged practice be "essential" or "indispensable" to the employer's business for it to pass muster: this degree of scrutiny would be almost impossible for most employers to meet....

*Wards Cove,* 109 S.Ct. at 2125–26 (citations omitted).

### B. *The Failure of the Evidence Presented*

The EEOC urges that both the disparate treatment and disparate impact theories apply to the set of facts present here. The court finds, however, that the EEOC has failed to prove a Title VII violation by a preponderance of the evidence under either theory.

### 1. *The Statistical Evidence*

■ The heart of the EEOC's disparate impact case was, of course, statistical evidence. The EEOC presented evidence through its expert, Farrell Bloch, Ph.D., of a disparity between the percentage of non-Koreans and Koreans in a general labor pool and the percentage of non-Koreans and Koreans who actually applied to and were hired by Consolidated in the Chicago area during the period alleged, 1983–1987.

Dr. Bloch's testimony purported to show a disparity between the percentage of non-Koreans and Koreans in the general labor pool and the percentage of non-Koreans and Koreans who actually applied to and were hired by defendant Consolidated. This court finds Dr. Bloch's statistical evidence unreliable, however, because it failed to determine properly the relevant labor pool.

The Supreme Court in *Wards Cove* highlighted the importance of making the proper labor pool comparison in utilizing statistics to make out a prima facie case in Title VII cases. The Court held:

> The "proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified ... population in the relevant labor market." [*Hazelwood School Dist. v. United States,* 433 U.S. 299, 308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977).] It is such a comparison—between the racial composition of the qualified persons in the labor market and the persons holding at-issue jobs—that generally forms the proper basis for the initial inquiry in a disparate impact case.

*Wards Cove,* 109 S.Ct. at 2121.

In *Mozee v. American Commercial Marine Service Co.,* 940 F.2d 1036 (7th Cir. 1991), the Seventh Circuit Court of Appeals also recently addressed the importance of selecting an appropriate pool for performing statistical analysis in Title VII cases:

> In selecting an appropriate pool and performing regression analysis in Title VII cases, the Supreme Court has taught that plaintiffs need not take into account "all measurable variables," but rather must simply include the major factors potentially responsible for any disparity. "Normally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday,* 478 U.S. 385, 400 [106 S.Ct. 3000, 3009, 92 L.Ed.2d 315] (1986). We have ourselves understood this principle to require that plaintiffs eliminate " 'the most common non-discriminatory reasons' "

for any suggested disparity. *Coates,* 756 F.2d at 541 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254 [101 S.Ct. 1089, 1094, 67 L.Ed.2d 207] (1981)). The trial judge's selection of the appropriate variables required to determine a suitable pool for comparison purposes is generally a question of fact and is reversible only if clearly erroneous. [*Equal Employment Opportunity Commission v.*] *Sears, Roebuck,* 839 F.2d [302] at 309 [ (7th Cir.1988) ]. "Especially where statistical evidence is involved, great deference is due the district court's determination of whether the resultant numbers are sufficiently probative of the ultimate fact in issue." *Soria v. Ozinga Brothers, Inc.,* 704 F.2d 990, 995 n. 6 (7th Cir.1983).

*Id.,* 940 F.2d at 1045.

The court upon weighing the evidence in this case finds that the statistical evidence presented by the EEOC is not sufficiently probative to demonstrate by a preponderance that unlawful discrimination has been Consolidated's regular procedure or policy. Specifically, the court finds that the in selecting an appropriate pool for statistical analysis, the EEOC's expert, Dr. Bloch, failed to properly consider a major variable potentially responsible for the statistical disparity—namely, whether members of the relevant labor pool were actually *interested* in the positions available at Consolidated. Because the lack of interest is admittedly a key, non-discriminatory reason which could explain any suggested statistical disparity which EEOC claims is evidence of discrimination, the court finds the EEOC's statistics unreliable.

Indeed, the EEOC's expert, Dr. Bloch, admitted that the labor force must properly be defined both as those workers who are qualified *and interested* in the positions Consolidated offered. (Tr. 85, 89.; Pl.Ex. 125 at 3.) Dr. Bloch's analysis, however, failed to properly consider the number of janitorial workers, if any, who were actually interested in Consolidated positions. Dr. Bloch assumed that the labor pools he utilized for his statistical comparison encompassed individuals interested in the jobs at issue based solely on what Dr. Bloch assumed were similarities between the "at issue" Consolidated jobs and certain other positions. (Tr. 89, 94–95.; Pl.Ex. 125 at 5–11.) The evidence in this case, however, established that the positions which Consolidated offered were unfavorable when compared with other janitorial positions: virtually all Consolidated positions were part-time—less than five hours per day (Tr. 727–728, 731.); wages were mostly $4.50–$5.00 per hour (Tr. 729, 749.); hours were often unfavorable (*see, e.g.,* Tr. 746.); fringe benefits were nonexistent (Tr. 748.) Nonetheless, Dr. Bloch's analysis failed to determine what part of the general labor pools he analyzed would or would not be interested in such positions.[2]

It is true that where figures for the general population might accurately reflect the pool of qualified job applicants, the Supreme Court has permitted Title VII plaintiffs to rest their prima facie case on such statistics. *Wards Cove,* 109 S.Ct. at 2121 n. 6, *citing, e.g., Dothard v. Rawlinson,* 433 U.S. 321, 329–330, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977). This, however, is not such a case. Dr. Bloch, though defining the relevant labor market as "the individuals who would be qualified for and interested in the jobs at issue" (Tr. 89.),

**2.** The labor pool which Dr. Bloch actually analyzed which is closest to the proper pool presumably is "part-time janitors and cleaners." At least this occupational category apparently contains only part-time employees doing janitorial work. (*See* Pl.Ex. 125 at 5.) The EEOC defined "part-time" as a job requiring between one and thirty-four hours per week. (Tr. 437.) Other than this description, the EEOC did not further define the occupational category "part-time janitors and cleaners."

Dr. Bloch's testimony does not establish to what extent the occupational category "part-time janitors and cleaners" shares other key characteristics with the positions available at Consolidated, such as undesirable working hours, low wages, no fringe benefits, etc. (*See, e.g.* Tr. 451–453, 503–504, 517 (census data does not reflect average compensation or wages earned, the time of day when individuals work, etc.).) This failure undermines the court's confidence in Dr. Bloch's statistical analysis, especially given Dr. Bloch's lack of familiarity with the actual positions available at Consolidated.

failed to properly evaluate the interest of the applicants as to the unfavorable nature of Consolidated's cleaner jobs. (Tr. 470–471.) In fact, Dr. Bloch included persons who were not interested in Consolidated's jobs in his purported "relevant labor market" and also included them as persons Consolidated rejected when in fact those persons had rejected Consolidated by not being interested in the jobs at Consolidated. (Tr. 479–480.) Dr. Bloch, whose company earned 75% of its income from the EEOC (Tr. 500.), on redirect tried to justify his failure to consider various factors on the basis that the data is not available. (Tr. 505.) Consequently, the court as fact finder believes the statistical basis of the EEOC's proof to be unreliable.

As the Supreme Court warned in *Wards Cove*, the pool of qualified job applicants must not be selected too broadly, as the EEOC has done here:

> [I]solating the cannery workers as the potential "labor force" for unskilled non-cannery positions is … too broad … in its focus. Too broad because the vast majority of these cannery workers did not seek jobs in unskilled noncannery positions; there is no showing that many of them would have done so even if none of the arguably "deterring" practices existed. Thus, the pool of cannery workers cannot be used as a surrogate for the class of qualified job applicants because it contains many persons who have not (and would not) be non-cannery job applicants.

*Wards Cove*, 109 S.Ct. at 2123.

The EEOC's failure to show that members of the labor pool would have been interested in the positions offered by Consolidated "even if none of [Consolidated's] arguably 'deterring' practices existed" renders its statistics unreliable. *Wards Cove*,

109 S.Ct. at 2123. As in *Wards Cove*, the EEOC's selected labor pool cannot be used as a surrogate for the class of qualified job applicants because it failed to take into account those persons who would not desire a position at Consolidated given the particular working conditions offered.[3]

If the EEOC had established a prima facie case of a pattern-or-practice of discrimination, the burden would shift to Consolidated to produce evidence of a business justification for its employment practice.[4] *Mozee*, 940 F.2d at 1049; *Wards Cove*, 109 S.Ct. at 2126. However, where, as here, the two groups compared by a plaintiff are obviously and substantially different in some relevant respect such that use of the comparison is unjustified to demonstrate disparate impact, the plaintiff's case fails at the threshold, without the court's having to reach the issue of business necessity. *Allen*, 881 F.2d at 379 and cases cited therein. Accordingly, this court need not address Consolidated's asserted business justifications for its employment practices.

■ If the EEOC had established a prima facie case, but was unable to persuade this court on the question of Consolidated's business necessity, the EEOC still may have prevailed. To do so, the EEOC would have had to persuade the court that other employment practices, without a similarly undesirable racial effect, would serve Consolidated's legitimate hiring interests. *Wards Cove*, 109 S.Ct. at 2126. By so demonstrating, the EEOC would have proven that Consolidated used its employment practices merely as a "pretext" for discrimination. *Id.* As the Court in *Wards Cove* noted:

> If [a plaintiff], having established a prima facie case, come[s] forward with alternatives to petitioners' hiring practices

---

3. The parties agreed that "[m]any individuals qualified for Consolidated's cleaner jobs would not seek them because they could command jobs more attractive in wages, benefits, and other working conditions." (Statement of Stipulated Facts, ¶ 20.)

4. Actually, given that there has been a full trial in this case, the issue of the EEOC's prima facie case drops out. As to disparate impact, the

ultimate question for this court to decide is whether the EEOC has proven, by a preponderance of the evidence, that Consolidated's employment practices are discriminatory because it has a disparate impact justified by the defendant's legitimate business needs. *Allen v. Seidman*, 881 F.2d 375, 379 (7th Cir.1989). The court finds based on all the evidence that the EEOC's proof has failed.

that reduce the racially-disparate impact of practices currently being used, and [defendant] *refuse[s]* to adopt these alternatives, *such a refusal* would belie a claim by [defendant] that [its] incumbent practices are being employed for nondiscriminatory reasons.

*Wards Cove,* 109 S.Ct. at 2126–27 (emphasis supplied).

In this case, however, the EEOC in addition to not establishing a prima facie case, has failed to prove that Consolidated refused to adopt the alternatives which the EEOC claims it should have embraced. For example, the EEOC presented evidence that the Illinois Job Service offered an alternative to Consolidated's hiring practices. (Tr. 528, 532, 543.) The EEOC presented no evidence, however, that Mr. Hwang knew during the relevant period that this alternative even existed. (Tr. 526–550.) On the contrary, Mr. Hwang testified that he had no idea that the Illinois job service existed. (Tr. 762–763.) Accordingly, because the EEOC failed to demonstrate that Mr. Hwang knew about and thus failed to adopt less discriminatory alternatives, the EEOC has presented no evidence to contradict Mr. Hwang's testimony that Consolidated used its employment practices for nondiscriminatory reasons. *Wards Cove,* 109 S.Ct. at 2126–27; *Allen v. Seidman,* 881 F.2d at 337.[5]

### 2. *The Challenged Employment Practices*

In addition to presenting flawed statistical data, the EEOC identified three particular employment practices of Consolidated which it alleged evidenced discrimination: (1) Consolidated's placement of a single, three-day advertisement for job openings in a Korean-language newspaper; (2) Consolidated's word-of-mouth recruiting methods; and (3) Consolidated's subjective hiring practices. (Tr. 779–80.) None of these alleged practices, however, were fully supported by sufficient credible proof at trial to be shown by a preponderance of the evidence. Moreover, even if the proof had been sufficient, none of these alleged practices prove discriminatory motive by Consolidated—a critical element of the EEOC's burden of proof for a disparate treatment case. *Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15.

█ For example, the EEOC admits that Consolidated placed only one job advertisement in a Korean-language newspaper—an advertisement which ran for three days. The mere fact that Mr. Hwang chose to advertise on one occasion in a Korean-language newspaper does not demonstrate that he harbored a discriminatory intent against non-Koreans. On the contrary, the court is convinced that Mr. Hwang did not discriminate against non-Koreans because Consolidated hired no one as a result of that ad in the Korean language newspaper. Besides, Mr. Hwang advertised in the general circulation newspaper the *Chicago Tribune* on more than one occasion with similar results.

█ Similarly, the undisputed fact that Mr. Hwang's applicants came to him primarily by word-of-mouth does not prove national origin animus by Consolidated against non-Koreans. Mr. Hwang was a member of the Korean community in the Chicago area. Mr. Hwang testified that he asked current Consolidated employees if they knew people who needed jobs only a couple of times between 1983 and 1987. (Tr. 39–40.) Mr. Hwang testified that people in his church sometimes came up to him and asked if he had jobs. (Tr. 40–41.) Mr. Hwang did not actively recruit at his church, however. (Tr. 40.) Moreover, the EEOC never established through Mr. Hwang what the national origin was of the members of his church. Mr. Hwang testi-

---

**5.** Similarly, the EEOC presented no evidence that Consolidated refused to advertise in newspapers of general circulation, instead favoring Korean-language newspapers. The EEOC's proof simply demonstrated that Consolidated placed advertisements in only two newspapers—a few advertisements in an English-language newspaper and one in a Korean-language newspaper. The EEOC has not proven that Mr. Hwang affirmatively refused to advertise in general circulation newspapers. Accordingly, the EEOC has presented no evidence which belies the credible testimony by Mr. Hwang which reflects that Consolidated did not use hiring and recruitment practices for discriminatory reasons.

fied that the Korean–Association of Chicago and the Korean–American Association sent employees to him. The court believed Mr. Hwang, however, when he stated that he never actively recruited through these organizations. (Tr. 43.)

Title VII does not require that Mr. Hwang, when approached about job opportunities by those around him, refuse to speak about those opportunities. On the contrary, the disparate treatment methodology requires proof of discriminatory motive. The EEOC's proof does not demonstrate that Mr. Hwang treated Koreans and non-Koreans differently, or that any such treatment was the result of national origin animus. It simply shows that Mr. Hwang responded to those around him who approached him about job opportunities. Such behavior falls far short of the proof of intentional discrimination required for a disparate treatment claim.

■ The third and final employment practice of which the EEOC complains is Consolidated's so-called "subjective hiring practices." Again, however, the EEOC's proof does not demonstrate the intentional discrimination required of a disparate treatment claim. The EEOC may have introduced such evidence as part of its disparate impact claim. However, because the court found unreliable the EEOC's statistical data relating to purported work force disparities, it need not reach the practices which the EEOC claims account for those purported disparities.

### 3. *The Anecdotal Evidence*

■ Finally, the EEOC presented four witnesses who apparently were to testify to specific instances of discrimination by Consolidated. Anecdotal evidence of discrimination may be used to supplement a showing of class-wide disparate treatment. Indeed, plaintiff classes often make out pattern-or-practice showings through "a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally." *Mozee*, 940

F.2d at 1050–51. The EEOC's anecdotal evidence, however, fails to prove an intent by Consolidated to treat non-Koreans unequally.

This case is unlike the situation in *International Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In *Teamsters* the plaintiff bolstered its statistical evidence with the testimony of credible individuals who recounted over forty specific instances of discrimination by the defendant. 431 U.S. at 338, 97 S.Ct. at 1856. Based upon that specific testimony, the district court concluded that the defendant had ignored black and Spanish-surnamed applicants, had given such applicants false or misleading information about job requirements, opportunities, and applications, and had considered such applicants differently from white applicants. *Id.* In striking contrast to the evidence presented in *Teamsters*, in this case the EEOC presented the testimony of only four individuals, none of whom were credible.

The EEOC first presented the testimony of Ms. Charlotte Carthen, whose national origin was unproven by her testimony.[6] Ms. Carthen responded in March 1985 to a newspaper advertisement placed by Consolidated. (Tr. 228.) She received and filled out an application for employment with Consolidated but was not hired. (Tr. 229.) According to the credible testimony of Mr. Hwang, the ad to which Ms. Carthen responded had been placed in the *Chicago Tribune* (Pl.Ex. 140.; Tr. 737.) However, Consolidated hired no one as a result of that ad because Consolidated failed to receive the contract which it was hoping to receive when it placed the newspaper advertisement. (Tr. 737.) Moreover, the EEOC presented no evidence that Consolidated had any jobs available that fit Ms. Carthen's desires. Before she applied at Consolidated, Ms. Carthen was employed as a receptionist. After she applied to Consolidated, she was employed as a receptionist. (Tr. 231.) The court in assessing Ms. Carthen's demeanor on the witness stand did not believe she was truly interest-

---

**6.** The EEOC never asked Ms. Carthen about her national origin.

ed in Consolidated cleaning work. Moreover, there was no proof Consolidated discriminated against her on the basis of her national origin even if she had testified to her national origin.

The EEOC next presented the testimony of David Wilkerson, another witness who did not testify to his national origin.[7] Mr. Wilkerson also applied for a job with Consolidated in 1985 based on a newspaper advertisement. (Tr. 236.) The court infers it was the same March 1985 *Chicago Tribune* ad (Pl.Ex. 140.) to which Ms. Carthen responded and from which Consolidated hired no one because it had no jobs to fill because it did not receive the contract. (Tr. 737.) Consolidated did not offer Mr. Wilkerson a job. (Tr. 237.) The court found Mr. Wilkerson's testimony incredible. For example, Mr. Wilkerson testified that he was unemployed when he applied to Consolidated in 1985. (Tr. 237.) Mr. Wilkerson later testified, however, that he in fact was employed by the Salem Service Company between 1984 and 1986. As with Ms. Carthen, Mr. Wilkerson never testified about acts of discrimination by Consolidated. He simply stated that he applied to but was not hired by Consolidated. (Tr. 236–237.) Consolidated's credible legitimate business reasons for not hiring him was that it had no open positions.

The EEOC's third anecdotal witness was Ricardo DeJesus. Mr. DeJesus was from Puerto Rico and testified that he found out about Consolidated through word-of-mouth—namely, from a non-Korean gentleman. (Tr. 249, 260.) That testimony was hardly evidence of the discriminatory impact of Consolidated's word-of-mouth recruiting methods. Moreover, the court found Mr. DeJesus' testimony inconsistent as well. Like the other witnesses, Mr. DeJesus applied to but was not employed by Consolidated. (Tr. 251.) However, Mr. DeJesus testified that he quit a job paying $6.50 an hour because his employer refused to give him a raise. (Tr. 263.) The court does not believe Mr. DeJesus was truly interested in a job that paid even less, such as the low-paying positions available at Consolidated.

The EEOC's final anecdotal witness was George Brown. He testified his nationality was black. (Tr. 264.) Mr. Brown testified he applied to Consolidated after reading a *Chicago Sun–Times* newspaper ad, but was not hired. (Tr. 265, 266.) Mr. Brown's testimony contained several inconsistencies. He was not credible. For example, Mr. Brown was adamant that he had learned about job openings at Consolidated through an advertisement in the *Chicago Sun–Times* newspaper—a newspaper in which Consolidated never placed any advertisements. (Tr. 273.) Moreover, Mr. Brown testified that he wanted a position paying $200.00 per week. (Tr. 273.) Again, the EEOC failed to demonstrate that Consolidated had a position paying that kind of money at the time Mr. Brown applied.[8]

What is most striking about the EEOC's anecdotal witnesses is not their testimonial inconsistencies. Most telling is that the EEOC presented no evidence whatsoever through these witnesses evidencing any acts by Consolidated which prove it discriminated against them because they were non-Korean. Unlike the *Teamsters* case, none of Consolidated's anecdotal witnesses testified to any specific acts of discrimination by Consolidated. The EEOC's anecdotal evidence simply establishes that Consolidated did not offer jobs to these four individuals. This is not evidence of an intent by Consolidated to discriminate against people seeking employment because they were not Korean.

In summary, then, the court finds that the EEOC has failed to prove by a prepon-

---

**7.** The EEOC failed to ask Mr. Wilkerson, too, about his country of origin.

**8.** On the contrary, the evidence indicated that Consolidated's positions paid less than $5.00 per hour for under 25 hours of work per week. (Tr. 727–729.) Additionally, Mr. Brown had been fired from a previous janitorial position, be-

cause he had been stealing the product of the facility he was supposed to be cleaning. (Tr. 275.) Mr. Brown failed to note that former employment on his application for employment to Consolidated. He was neither honest nor credible.

derance of the evidence that national origin discrimination was Consolidated's "standard operating procedure." *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855. The EEOC's proof fails under both the disparate impact and the disparate treatment methods of proof. The EEOC failed properly to demonstrate disparate impact because its statistics did not properly consider the relevant labor pool—those individuals both qualified *and interested* in the janitorial positions available at Consolidated. The EEOC failed to prove disparate treatment because none of its evidence demonstrated that Consolidated intentionally discriminated against non-Koreans. Accordingly, judgment must be entered in favor of Consolidated.

## III. CONCLUSION

For the reasons stated in this memorandum opinion and order: (1) JUDGMENT is entered in favor of defendant Consolidated and against plaintiff EEOC; (2) this case is DISMISSED in its entirety.