**Mary Ann Carter RENNIE,
Plaintiff–Appellant,**

v.

**John DALTON, Secretary of the
Navy,\* Defendant–Appellee.**

**No. 92–2644.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 27, 1993.

Decided Aug. 27, 1993.

---

\* This action was commenced in 1986 against the Secretary of the Navy, James H. Webb, Jr. Since that time, several different individuals have served as Secretary. Pursuant to Fed.R.App.P.

43(c)(1), a public officer who replaces his or her predecessor will automatically be substituted without prejudice to either party.

Richard L. Darst, Mantel, Cohen, Garelick, Reiswerg & Fishman, Indianapolis, IN, for plaintiff-appellant.

Winfield D. Ong, Office of the U.S. Atty., Indianapolis, IN, for defendant-appellee.

Before COFFEY and EASTERBROOK, Circuit Judges, and WOOD, Senior Circuit Judge.

COFFEY, Circuit Judge.

In 1982, after being dismissed from the Naval Avionics Center ("NAC"), Mary Ann Carter Rennie filed a complaint with the Equal Employment Opportunity Office ("EEO") at NAC alleging sexual harassment during the course of her employment. Several years later, after an EEO investigation, the Equal Employment Opportunities Commission ruled that no sexual harassment occurred. Thereafter, in 1986, Rennie filed this suit against the Navy for sexual discrimination and unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (1988). After a bench trial in which both parties called numerous witnesses to testify, the district court issued an opinion listing 117 separate factual findings and held that the Navy had not discriminated against Rennie on the basis of sex nor retaliated against her for

making an EEO complaint. Rennie appeals. We affirm.

## I. BACKGROUND

### A. Factual History[1]

At the time of the alleged incident at the Naval Avionics Center ("NAC"), Mary Ann Carter was a twenty-five year-old single female living with her parents and one child. She was a high school graduate with previous employment experience at Ford Motor Company, Research Engineering, and Contact Metal Welding as an assembler of parts. NAC is a civilian facility operated by the Navy in Indianapolis, Indiana, that manufactures customized electronic components for the Navy including classified military and navigational equipment. Due to the sensitive military equipment NAC manufactures, soldering is one of the most essential skills required in NAC's manufacturing process and thus its soldering standards are considerably higher than in commercial settings.

In March 1982, Mary Ann was hired for a temporary position at NAC as an electronics mechanics helper ("EMH") contingent upon her passing a government soldering course. Prior to the time she commenced employment with NAC, she had had no previous soldering experience. She alleges that NAC failed to inform her that she would have to do soldering work until after she was hired. Since 1962, NAC has required everyone who does soldering to take a soldering course and pass a two-part exam consisting of written and practical components designed to test their soldering skills.

The course curriculum and requirements of the test were set forth in the Quality Workmanship Standard, which also set forth NAC's soldering quality standards. The soldering course included several days of instruction after which the students underwent both a written exam (graded by the instructor) and a practical exam which involved applying various soldering techniques on a chassis. The instructor graded the practical exam and forwarded it to Quality Audits which gave the final binding grade on the practical exam.[2]

At the time of the alleged incident the full-time soldering instructor at NAC had retired and Joseph Cafrelli had been transferred from an NAC soldering unit and employed as a part-time instructor. Before taking over the soldering course, Cafrelli received two weeks of instructor training from the NAC Quality Audits Department. It should be pointed out that Cafrelli has never been the subject of a sexual harassment complaint before now.

On April 8, 1982, the plaintiff and three other students commenced an NAC soldering course that was completed on April 16, 1982. The classroom was very "cramped and small" and it was most difficult for more than one person to move around at the same time. The students were under more than the normal classroom pressure for if they failed the course they would lose their temporary employment. The record reflects that to the best of his ability, Cafrelli tried to ease the tension by permitting the class members to engage in casual conversation. On the first day of class his communication took the form of what might be classified as an ill-advised off-color joke. Cafrelli admitted to telling the joke and was later rebuked by one of the students, Lamona Leal, for his actions. Later, he apologized to Leal and the class for his exercise of poor judgment and bad taste. Cafrelli also participated in a discussion in the class regarding a strip bar known as the "Harem House." Rennie claims that Cafrelli said he had gone to the Harem House, "paid five dollars and didn't even get a feel," and he asked her if she had ever been to Scarlet's Strip Bar. The court found that neither the off-colored joke nor the discussion regarding the strip bar were directed towards Rennie nor did she ever mention much less complain to Cafrelli about these comments.

Rennie alleged that Cafrelli touched her and stared at her for long periods of time which in turn made her quite nervous. Sur-

1. Our version of the facts relies primarily on the trial court's findings.

2. Quality Audits maintained a "blind grading system" in which each practical test was only identified by a tag bearing the student's confidential number.

prisingly, none of the other students testified that they observed any type of staring or physical contact, let alone any offensive touching between the two. On the other hand, the students testified that Cafrelli was a good instructor and they observed special efforts on Cafrelli's part to help Rennie because she was the only one in the class experiencing difficulty with the soldering program due to her lack of manual dexterity. The district court found that because of the limited area in the classroom (20 feet by 40 feet including many cabinets and work benches), the other students would obviously have been aware of any harassing contacts. The trial court attributed Cafrelli's attention to Rennie as nothing but the usual observation an instructor pays to a student having difficulty in a classroom environment.

During the first soldering course, Rennie became defensive as well as argumentative when Cafrelli critiqued her work product. At this juncture, Cafrelli requested the assistance and advice of his immediate supervisor, Aubrey Ward, as well as his and Rennie's supervisor, Everett Rance, on how to deal with Rennie in class. Rance advised him to be careful not to aggravate the situation. At one point, Cafrelli asked Rennie if she appreciated how he was trying to help her. Thereafter, Rennie complained to two students, Lamona Leal and Robbie Sharp, that the instructor was making her nervous. Rennie implied to Sharp (whom she dated) that Cafrelli was sexually harassing her but Sharp never observed any harassment.

At the end of the course, the students took the two-part examination. Cafrelli graded the written exams and gave Rennie a passing score of seventy-six. In addition, he scored the other students' practical exams (except for Rennie's) and forwarded them to Quality Audits which also graded them. In order to avoid questions of personal bias, Cafrelli felt that it was best that he did not grade Rennie's practical test; consequently, he sent Rennie's practical test directly to Quality Audits for an anonymous grading without evaluating it himself. Larry Songer graded Rennie's test for Quality Audits (not knowing it was Rennie's because of the blind grading system) and gave her a failing grade of thir-ty-eight (a passing score of seventy was required). Songer characterized Rennie's work as "grossly unsatisfactory." He then forwarded Rennie's practical test to Charles Rueter, Chief of Quality Audits and one of only three "grade A" senior examiners in the military. Rueter confirmed the score and later met with Rennie to discuss her performance and how she could improve. Rennie never mentioned anything about Cafrelli during this conversation.

After learning that Rennie had failed the class, Everett Rance, her supervisor, arranged for her to repeat the course. Rennie and one other student who had also failed a prior course began a second course with Cafrelli as the instructor on April 26, 1982. Initially, Rennie's performance in the repeat course demonstrated marked improvement but shortly thereafter, her soldering work began to deteriorate. When Cafrelli tried to instruct her she again responded defensively. In response to a critique of her work, Rennie told Cafrelli that she was considering filing an EEO complaint which Cafrelli perceived as a threat. On April 27, 1982, Cafrelli went to his supervisor (Everett Rance) to discuss this attempted intimidation. Rance asked Fred Seddon, Rennie's immediate supervisor to meet with her in hopes of identifying and solving the problem. Rennie told Seddon that although she previously had a small problem, it had been taken care of and that now "everything was okay." Rance also suggested to the instructor that he keep his distance from Rennie and that he be careful not to exacerbate the situation. The next day Cafrelli cautioned Rennie about the quality of her work, at which time she responded that if she failed the class she would go to the EEO office at NAC. That same day, Rennie carried out her threat and went to the EEO office and complained to Jackie Miller that Cafrelli was staring at her and "giving her the eye."

Subsequently, Rance spoke with Cafrelli and suggested that because Rennie felt intimidated by him, it would be advisable for him to remain as "separate" or "absent" from Rennie as possible during the practical test in order to avoid further accusations and/or problems. Cafrelli stayed in the room dur-

ing the test in order to monitor the students and answer questions but he placed a movable blackboard between himself and Rennie to prevent any further accusations of staring.[3] Despite the placement of the blackboard, Jesse Crosby, the other student, testified that Cafrelli continued to answer questions and assist both students during the test. Rennie testified that after Cafrelli placed the blackboard between them he appeared to be angry and acted "smart-alecky" towards her. Crosby disagreed and stated that he never witnessed the conduct Rennie described and certainly was in a position to observe it had it occurred. During the exam, Rennie sought assistance from Crosby, but Cafrelli prohibited this claiming that if she were to fail it could be because of Crosby's incorrect advice. The instructor testified that he observed Rennie's hands were shaking during the exam. Afterwards, he graded Rennie's second practical test and gave it a failing grade of forty-five. The test was then forwarded to Quality Audits where it was graded by Larry Songer (using the blind grading system) who gave it a score of twenty-six. The grade was confirmed by Charles Rueter, the Chief of Quality Audits.

NAC terminated Rennie after she failed the second soldering course because NAC had a personnel management policy in 1982 of not transferring temporary employees to a position other than that for which they were originally hired. Rennie was hired as an electronics mechanics helper ("EMH") in Branch 235. All but one section in Branch 235, encapsulation, required completion of the soldering course. Because there were no EMH positions available in the encapsulation unit at the time, Rennie was discharged. Rennie reapplied to NAC on February 3, 1983. This timely reapplication served to keep her on the eligible list for an EMH job for six more months. After this period, she failed to take the necessary steps to keep herself on NAC's eligible list of hirees.

### B. Procedural History

Rennie's final day of work was May 8, 1982. Just ten days later, on May 18, 1982, Rennie filed a written complaint with the EEO Office at NAC. On June 9, 1982, the NAC requested the appointment of an EEO investigator by the Naval Civilian Personnel Command, Northern Field Division, Philadelphia, Pennsylvania. An investigator was appointed on July 12, 1982. On November 18, 1982, the EEO Office at NAC issued an investigator's report finding that Rennie was not sexually harassed, nor sexually discriminated against, nor discharged in retaliation for complaining of the alleged Title VII violations. Rennie sought review of the investigator's report from a Complaints Examiner at the Equal Employment Opportunity Commission ("EEOC"). The EEOC held a hearing on May 20, 1983 and on December 29, 1983, issued a proposed ruling, finding that Cafrelli's off-color joke in class constituted sexual harassment but that no sexual advances were made. However, the Complaints Examiner failed to find any evidence to support a claim of sex discrimination or a claim of retaliatory discharge. On May 17, 1984, the Navy refused to adopt the report of the Complaints Examiner because the Secretary believed that a single off-color joke did not qualify as a hostile environment or sexual harassment. Rennie appealed the Navy's ruling to the EEOC which, on June 25, 1986, affirmed the Navy's decision.

In 1986, Rennie filed this lawsuit in the district court alleging sexual discrimination and unlawful retaliation. The Navy moved to dismiss because the plaintiff never asserted retaliation in her EEO claim. Shortly thereafter, she filed a second lawsuit this time alleging that the NAC's refusal to re-

---

**3.** The record is unclear as to whose idea it was for Cafrelli to sit behind the blackboard. Cafrelli testified at trial that "I believe it was Aubrey Ward said [']what can we do about this,['] and somehow the suggestion came up about sitting behind the blackboard...." Cafrelli testified on cross-examination. "Someone else suggested that a good way to separate myself from Mary in the classroom was to sit behind the chalkboard." When asked who suggested it, Cafrelli testified "I don't remember. It would have been probably Aubrey Ward...." Despite this testimony, the trial court's findings of fact failed to attribute responsibility for the blackboard idea to Aubrey Ward. The court found "the instructor placed a blackboard between himself and plaintiff because it would mean the plaintiff would be unable to accuse the instructor of staring at her." *Rennie v. Garrett*, No. IP 88–0652–C (S.D.Ind. June 11, 1992) at 8.

hire her was in retaliation for her filing an EEO complaint. The trial court dismissed both complaints on the grounds that Rennie had not exhausted her administrative remedies because she had failed to file an EEO complaint alleging retaliation. On appeal, this court remanded the action to the district judge, holding that the plaintiff need not file a second EEO complaint to satisfy the exhaustion of remedies doctrine. *Rennie v. Garrett*, 896 F.2d 1057 (7th Cir.1990). On remand, the parties agreed before trial to treat the second complaint as an amendment of the first and address all allegations therein.

## II. *ISSUES*

On appeal, Rennie claims that the trial court erred in finding: (1) that she was not sexually harassed; (2) that she was not subjected to retaliatory treatment during the second soldering class; (3) that the NAC's failure to transfer or rehire her was not in retaliation for her making an EEO complaint; and (4) that the district court abused its discretion when it denied her motion to compel the production of Navy documents under Fed.R.Civ.P. 34.

## III. *DISCUSSION*

### A. *Standard of Review*

■■■ Rule 52(a) of the Federal Rules of Civil Procedure requires that we review the trial court's finding of facts under a clearly erroneous standard. The trial judge has the best "opportunity to observe the verbal and non-verbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, [displays of nervousness,] posture and body movement...." *Churchill v. Waters*, 977 F.2d

1114, 1124 (7th Cir.1992), *cert. granted,* — U.S. ——, 113 S.Ct. 2991, 125 L.Ed.2d 686 (1993). If there are two permissible views on the evidence, the district court's choice between them cannot be clearly erroneous. *Swanson v. Elmhurst Chrysler Plymouth, Inc.*, 882 F.2d 1235, 1237 (7th Cir.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 774 (1990). Review on issues of law is *de novo, Mozee v. American Commercial Marine Service Co.*, 940 F.2d 1036, 1044 (7th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 207, 121 L.Ed.2d 148 (1992), but "[i]f the trial judge correctly states the law, then his findings as to whether the facts meet the legal standard will be disturbed only if they are clearly erroneous." *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1269 (7th Cir. 1991).

### B. *Hostile Environment Sexual Harassment*

■■■ Rennie alleges that Cafrelli's actions created a hostile work environment which she argued rose to the level of sexual harassment. A mere allegation is insufficient, however, to render the defendant liable. The Supreme Court, in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), held that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Id.* at 66, 106 S.Ct. at 2405. The Court went on to state that "for sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* at 67, 106 S.Ct. at 2405 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)).[4] *Meritor* concluded

4. The Equal Employment Opportunity Commission (EEOC) issued Guidelines explaining that "sexual harassment" is a type of sex discrimination prohibited under Title VII. The Guidelines state, in part:

"(a) Harassment on the basis of sex is a violation of section 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either

explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

29 C.F.R. § 1604.11(a). The Supreme Court has noted that "these Guidelines, while not control-

that "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome' ... [T]he question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact...." *Id.* at 68, 106 S.Ct. at 2406. We have held that "only if the court concludes that the conduct would adversely affect the work performance and the well-being of both a reasonable person and the particular plaintiff bringing the action may it find that the defendant has violated the plaintiff's rights under Title VII." *Brooms v. Regal Tube Co.,* 881 F.2d 412, 419 (7th Cir.1989); *Swanson,* 882 F.2d at 1238. Thus there is both a subjective and objective component of a harassment claim. The plaintiff must establish that *she* was adversely affected by the conduct and that a *reasonable* person would also have been adversely affected. *Id.* Moreover, "[i]solated and/or trivial remarks of a sexual nature" do not satisfy the definition of sexual harassment: "the offensive conduct must be persistent." *Downes v. FAA,* 775 F.2d 288, 293 (Fed.Cir.1985). In *Swanson,* this court set forth a five-part test for a plaintiff to maintain a Title VII claim based on hostile work environment sexual harassment.

"(1) The employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile, or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (5) the existence of respondeat superior liability."

*Swanson,* 882 F.2d at 1238.

While Rennie satisfied a few of the elements of her prima facie case ((1) she is a member of a protected class, (3) the harassment was based on sex, and (5) respondeat superior liability exists), she fell short of satisfying all of the required elements. The plaintiff failed to present any evidence of sexual advances much less any proof of requests for sexual favors. She instead bases her argument on one off-color joke and a conversation about a strip bar, but the district court found she failed to establish that either communication was directed at her personally. She also alleges that Cafrelli stared at her and touched her, however, the trial court found this to be untrue for if any staring or touching had occurred in the limited quarters of the classroom, the other students would have observed it. The record supports this finding.

The plaintiff has also failed to establish that the alleged sexual harassment "had the effect of unreasonably interfering with [her] work performance in creating an intimidating, hostile, or offensive working environment that affected seriously [her] psychological well-being." *Id.*[5] We are in agreement with the finding that Cafrelli's alleged conduct did not interfere with the plaintiff's work performance, for the record before us falls far short of demonstrating "demeaning conduct and sexual stereotyping [resulting in] anxiety and debilitation to the plaintiff [such] that working conditions were 'poisoned' within the meaning of Title VII."

---

ling upon the courts by reason of their authority, do constitute of body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404 (quoting *General Electric Co. v. Gilbert,* 429 U.S. 125, 141–142, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976)).

**5.** The Supreme Court has granted a petition for certiorari in a Sixth Circuit case in which the court dismissed a plaintiff's sexual harassment claim because the alleged conduct did not "seriously affect [her] psychological well-being." *Harris v. Forklift Systems, Inc.,* 1991 WL 487444

at *7, 1990 U.S. Dist. LEXIS 20115 at *18 (Nov. 28, 1990), *aff'd,* 976 F.2d 733 (6th Cir.1992), *cert. granted,* —— U.S. ——, 113 S.Ct. 1382, 122 L.Ed.2d 758 (1993). While we have mentioned this element (effect on psychological well-being), our holding does not depend on it for not only did Rennie fail to present any evidence that the alleged conduct had a serious affect on her psychological well-being, but she also failed to establish that she "was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature...." *Swanson,* 882 F.2d at 1238.

*Brooms,* 881 F.2d at 418 (quoting *Scott v. Sears, Roebuck & Co.,* 798 F.2d 210, 213 (7th Cir.1986)). Likewise, Rennie has failed to demonstrate that Cafrelli's conduct would have adversely affected the work performance of a reasonable person. *Brooms,* 881 F.2d at 419. Since the court failed to find that sexual harassment occurred, a reasonable person certainly would not have been affected by Cafrelli's actions. *See Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1274 (7th Cir.1991). Rather than attributing Rennie's poor performance to the alleged harassment, the trial court found that Rennie lacked the manual dexterity to meet the NAC soldering standards. We are in agreement with this finding and add further that it is common knowledge that some individuals get very nervous during testing procedures especially when they are unprepared or lack the requisite skills. We are of the opinion that the alleged conduct was insufficient as a matter of law to support a harassment claim because an isolated joke and conversation about a strip bar, even though we might consider offensive and in very poor taste, were not "persistent" nor did they "poison" the work environment. Based upon our review of the record, we hold that the district court finding was not clearly erroneous and that the isolated incidents fall short of the requisite level of hostility or pervasiveness needed to establish a hostile work environment violation under Title VII.

Finally, we are perplexed by the plaintiff's allegation that the trial court considered only "one dirty joke" to the neglect of the other alleged harassing acts. The court's conclusions of law regarding hostile environment sexual harassment clearly discuss both the joke and the conversation relating to the strip bar, *see Rennie v. Garrett,* No. IP 88–0652–C (S.D.Ind. June 11, 1992) at 18 (Conclusion of Law No. 9), thus, we conclude that Rennie's argument that the trial court failed to consider all the evidence in ruling on sexual harassment is without merit.[6]

## C. Retaliatory Harassment

■ Rennie asserts that she was subjected to retaliatory harassment when: (1) Cafrelli placed the blackboard between them during the second soldering test, (2) she was discharged without being transferred to another position, and (3) the NAC failed to rehire her in 1983. She believes that NAC's actions were in response to her talking to the EEO counselor about the alleged sexual harassment and ultimately filing an EEO complaint.

■ The district court observed that in order for Rennie to prevail in her Title VII case of retaliation she had to satisfy the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[7] *McDonnell Douglas* held that the plaintiff must initially establish a prima facie case of discrimination. The burden then shifts to the employer who must articulate a legitimate and nondiscriminatory reason for its actions. If the employer succeeds, the plain-

6. At oral argument, counsel for the plaintiff repeatedly stated that the district court made findings regarding "quid pro quo" sexual harassment, yet counsel maintained that the plaintiff never alleged "quid pro quo" at trial. Despite counsel's assertion, the plaintiff, in her brief and trial testimony stated that she "believed that the temporary instructor wanted a sexual favor," Appellants Brief at 12, which sounds a lot like "quid pro quo." At trial, the court was unable to understand what theories the plaintiff was relying on because of the plaintiff's contradictory assertions and pleadings. The trial court's findings regarding "quid pro quo" obviously represent its attempt to address all possible theories based on the evidence submitted. However, because the plaintiff has disavowed any "quid pro quo" claim on appeal, we fail to see a need to address it.

7. In *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Supreme Court clarified the *McDonnell Douglas* shifting burdens framework. In *Hicks,* the plaintiff argued that if the trier of fact rejects the defendant's stated reasons for undertaking the challenged action, i.e. terminating the employee, the court is compelled to find for the plaintiff. The Supreme Court refused to adopt this position stating that "although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)).

tiff may still prevail by demonstrating that the employer's stated reasons for the challenged action are merely pretextual and the employer's actual reason was discriminatory. *See id.* at 802–04, 93 S.Ct. at 1824–25; *Holland v. Jefferson National Life Insurance Co.,* 883 F.2d 1307, 1313 (7th Cir.1989). A prima facie case of retaliation exists when the plaintiff establishes that "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse action." *Holland,* 883 F.2d at 1313. We examine the plaintiff's allegations of retaliation in turn, reviewing the district court's findings under the clearly erroneous standard. *Pullman–Standard v. Swint,* 456 U.S. 273, 290, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982).

Rennie's complaint to the EEO office during the second soldering course constituted statutorily protected expression. *See,* 42 U.S.C. § 2000e–3(a). She claims that Cafrelli's treatment of her during the second soldering class (placing the blackboard between them) was an "adverse action" and that the placement of the blackboard was directly linked to her EEO complaint. The trial court found that Cafrelli's placing the blackboard between himself and the plaintiff during the second exam did not constitute adverse treatment because Cafrelli continued to answer questions and work with the students. The court concluded that it was Rennie's own choice not to seek help from the instructor during the exam. Although Cafrelli's deployment of the blackboard in some peoples' minds may have been considered "childish," (as the trial court found), placing the blackboard between himself and Rennie enabled Cafrelli to remain in the room during the test yet separated from Rennie to avoid any suggestion much less accusation that he was staring at her. While we recognize that the placement of the blackboard might be classified as different treatment, albeit a slight difference, we hold that it did not rise to the level of adverse treatment because the instructor still made himself available to answer questions and the placement of the blackboard was an attempt to respond to the plaintiff's concern that Cafrelli was staring. We accept the trial judge's finding of facts on

this point because it depends largely on the credibility of Cafrelli, Jesse Crosby (the other student) and the plaintiff. In fact, the plaintiff conceded in her deposition that using the blackboard as a partition was a "good idea." Accordingly, we affirm the district court judgment.

■ Rennie's second allegation of retaliation involved the Navy's refusal to transfer her to a different position after she failed to achieve a passing grade in her second soldering course. She claims that her failure to pass the soldering exams was due to sexual harassment and therefore her failure cannot serve as a reason for discharge. *EEOC v. Board of Governors,* 957 F.2d 424, 427–428 (7th Cir.) (the reason for the discharge must be "unrelated to the employee's participation in a protected activity" such as filing an EEO complaint), *cert. denied,* —— U.S. ——, 113 S.Ct. 299, 121 L.Ed.2d 223 (1992). Because we agree with the trial court's finding that Cafrelli did not sexually harass Rennie, her failure on the exams may serve as a legitimate reason for the discharge. The record supports the trial judge's finding that Rennie lacked the manual dexterity to meet NAC soldering standards. Thus the record is clear that Rennie was discharged because she was unqualified for the position and not because of retaliation. At the time of her discharge, NAC's regulations prohibited transferring any temporary employee from the position for which she was hired to any other position. Because all available EMH positions at the time of her discharge required soldering, NAC had no choice but to release her. We affirm the trial court's finding that Rennie was not qualified for soldering and that NAC's regulations prohibited transferring her to another position.

■ Finally, Rennie alleges that when she reapplied in February 1983, the NAC refused to rehire her because of her prior EEO complaint. We apply the same analysis employed in the preceding allegation. When Rennie reapplied in 1983, she sought the identical EMH position that she held prior to her discharge. Once again in 1983, the only EMH positions available required soldering skills, a task for which Rennie was unsuited.

Therefore, NAC declined to rehire her. In fact, the trial judge found that the encapsulation section, the only unit without a soldering requirement, had not hired any new employees for the two years subsequent to Rennie's discharge in 1982. The record supports the district court finding that NAC's actions in refusing to rehire her were not retaliatory, but were prompted by Rennie's lack of qualifications for the EMH position. Not only has Rennie failed to establish a prima facie case of retaliatory discharge, but she has also failed to rebut NAC's rationale for refusing to rehire her, i.e. no available positions. She has been unable to come forth with evidence of a single similarly situated applicant who was transferred or not rehired.[8] Thus, we are convinced that NAC's decision not to rehire Rennie was proper and without retaliatory motive.

### D. Denial of Rennie's Motion to Compel Production of Documents

 Rennie complains that the district court erred in denying her motion to compel Naval Department documents pursuant to Federal Rule of Civil Procedure 34. Trial courts have "broad discretion" over discovery matters. *Dole v. Local 1942 Int'l Bhd. of Elec. Workers, AFL–CIO,* 870 F.2d 368, 371 (7th Cir.1989). We review a trial judge's pretrial discovery ruling under a clear abuse of discretion standard. *Id.* Apparently, Rennie had seen references to internal Naval Department documents relating to military women and she sought production of those documents to demonstrate a pattern of the Navy tolerating sexual harassment and discrimination. The district court denied the motion to compel disclosure because: (1) the documents dealt with duly enlisted female Navy personnel as contrasted with civilian employees, (2) they were not relevant, (3) the plaintiff could get the documents from other sources, and (4) it was a burdensome request.

While other allegedly discriminatory conduct by an employer can be relevant in a Title VII action, *Phillip v. ANR Freight Systems, Inc.,* 945 F.2d 1054 (8th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 81, 121 L.Ed.2d 45 (1992), the trial court found that Rennie failed to demonstrate any relation between the documents concerning enlisted personnel and her employment at NAC (a civilian branch of the Navy). In light of the extensive discovery and testimony the trial court permitted regarding all prior sexual harassment claims against NAC, we hold that it was not a clear abuse of discretion to deny Rennie's production requests. Clearly the court had the responsibility to draw the line as to what was and was not relevant to Rennie's claim. Her request exceeded the bounds of relevance because the documents involved enlisted personnel in an entirely different setting.

### IV. SANCTIONS FOR FILING FRIVOLOUS APPEAL

 While Rennie may have entertained some hope of prevailing before the trier of fact, once the district court ruled against her on all the important factual issues, she could not possibly have maintained any reasonable belief that we would reverse the court's findings on appeal. The only hope Rennie had of prevailing on appeal was for us to reverse the trial judge's findings of fact which were based on the credibility of several witnesses. "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each or whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). In the case before us, not only was Rennie's

---

**8.** Rennie pointed out that there were two other employees who had failed the soldering test but were not terminated. Amelia Sanders was a thirty-year *permanent* employee (in contrast to Rennie being a temporary employee) who failed the test four times, but had soldering removed from her duties shortly before she retired. The second, a man with dyslexia also failed the test but was placed in another non-soldering EMH

position which was available at the particular time. As previously explained, however, there were no EMH positions available which did not require soldering at the time Rennie failed the second exam. In situations more analogous to the plaintiff's, the district court found that three other temporary employees had failed the exam twice and had been terminated.

testimony contradicted by all the other students in her soldering class but it was denied by Cafrelli as well. Accordingly, we believe Rennie's appeal was frivolous as all she did was restate and reargue facts and credibility issues previously ruled upon in the district court. *See Spiegel v. Continental Illinois Nat'l Bank*, 790 F.2d 638, 650 (7th Cir.) ("[a]n appeal is frivolous where the result is obvious or when the appellant's argument is wholly without merit"), *cert. denied*, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986); *see also Smith v. Blue Cross & Blue Shield*, 959 F.2d 655, 661 (7th Cir.1992) ("[s]anctions are appropriate if the appeal was prosecuted with no reasonable expectation of altering the district court's judgment and for purposes of delay or harassment or sheer obstinacy").

 We are of the opinion that sanctions are appropriate under Rule 38 in this case for the very same reasons we stated in *District No. 8, Int'l Assoc. of Machinists & Aerospace Workers, AFL–CIO*, 807 F.2d 618, 623 (7th Cir.1986),

> "This case 'has caused a shameful waste of judicial manpower.' ... The appellant has caused this court to spend valuable time and energy on a completely meritless matter while the serious concerns of other litigants have had to wait for resolution.... Therefore, pursuant to Rule 38 of the Federal Rules of Appellate Procedure, we award [the appellee] its costs and reasonable attorneys' fees on appeal...."

*Id.* (citations omitted). Because the plaintiff was most likely without knowledge of the legal standard of review she faced on appeal, we direct that her appellate counsel, who should have known the appropriate legal standards, pay the appellee-defendant's costs and reasonable attorneys' fees stemming from this appeal. Pursuant to Circuit Rule 38, we must provide reasonable notice to counsel that we are contemplating sanctions and give an opportunity to respond. Counsel for Rennie shall submit its response to the sanctions to the clerk of this Court within fifteen days of the date of this opinion. Counsel for the Secretary of the Navy shall also submit to the clerk of this Court within fifteen days an accounting of attorney's fees and costs incurred in this appeal.

## V. CONCLUSION

Rather than employing Title VII as a shield to protect her from prohibited conduct, it appears that the plaintiff is using the statute as a sword to gain a position with NAC for which she was unqualified. The record fails to support her claims.

AFFIRMED.