94 F.3d 647
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Michael J. JORDAN, Plaintiff-Appellant,
v.
A.T. KEARNEY, INCORPORATED, Defendant-Appellee.
 No. 95-3848.
 United States Court of Appeals, Seventh Circuit.
 Argued July 9, 1996.
Decided Aug. 15, 1996.
 
 Before CUMMINGS, KANNE and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Michael J. Jordan sued his former employer, A.T. Kearney, Inc., claiming that he was fired because of his gender. 42 U.S.C. §§ 2000e et seq. The district court granted Kearney's motion for summary judgment on the ground that Jordan had failed to establish sex discrimination under the McDonnell Douglas burden-shifting framework. Jordan appeals. Kearney has filed a motion in this court for sanctions under Fed.R.App.P. 38. We affirm the grant of summary judgment and deny the motion for sanctions.
 
 I. BACKGROUND
 
 2
 Kearney is a company headquartered in Chicago whose business includes management consulting. Kearney employs about 1,800 people worldwide and almost 400 people in its Chicago office. Michael J. Jordan, a white male, was employed by Kearney as a "Resources Specialist" in the Corporate Information Center from April 1990 to June 1, 1992, at which time he was fired. As a Resources Specialist, Jordan's responsibilities involved data entry and research, and included typing responsibilities.[1]
 
 
 3
 Jordan's co-worker, Arlene Arp, performed many of the same duties as Jordan, though she was more senior and had a slightly different title, "Resources Assistant." After Jordan arrived in April 1990, his supervisor, Pat Porter, was responsible for training him. As it turned out, Arp was told to train Jordan in a number of his duties, at least in part because Arp, but not Porter, was familiar with the Oracle computer system that Jordan needed to learn.
 
 
 4
 Kearney provided regular feedback to its employees on their performance. In Arp's 1991 review, Porter criticized Arp for making too many mistakes and for not getting her work turned around fast enough. Her performance evaluation indicated "improvement needed" in the areas on accuracy and time management. At times, Porter corrected Arp's mistakes without mentioning them to Arp. Arp was never placed on probation for making errors.
 
 
 5
 In October 1990, Jordan received his six-month performance evaluation from Porter. The performance evaluation form indicated "improvement needed" in the areas of accuracy and productivity. In all ten other applicable performance categories, the six-month evaluation rated Jordan's performance as "satisfactory" or better. Jordan received an overall evaluation of "satisfactory." Jordan received a merit raise after this evaluation.
 
 
 6
 In April 1991, Jordan received a one-year performance evaluation, again from Pat Porter. Again, Jordan received a performance rating of "improvement needed" with respect to accuracy and a rating between "satisfactory" and "improvement needed" with respect to productivity. His overall evaluation rose slightly over his last evaluation to between "satisfactory" and "exceeds average expectations." Jordan again received a merit raise after this evaluation.
 
 
 7
 In April 1992, Jordan received a two-year evaluation that covered his performance from April 1991 to April 1992. This evaluation indicated a sharp decline in Jordan's performance. Jordan's highest rating in any of the twelve applicable categories was "satisfactory," and he received that rating in just three categories. He received a rating of "improvement needed" in professionalism, initiative, time management, communication, and goal setting. He received a rating of "unsatisfactory" in judgment, job execution, accuracy, and productivity. His overall rating fell to between "improvement needed" and "unsatisfactory."
 
 
 8
 On April 17, 1992, Jordan met with Pat Porter to discuss his second annual performance review. Porter told Jordan at this time that he was being placed on probation for four weeks because of poor job performance, and, specifically, for accuracy and productivity deficiencies in his work. Jordan was informed that failure to improve would result in his termination.
 
 
 9
 At this same meeting, Jordan told Porter that his father was terminally ill and that he expected to take leave at or near the time of his father's death. Porter did not object to this request. Porter made an inquiry with the human resources department regarding the procedures for obtaining such time off before or after the death of a close family member. Porter then informed Jordan that he would need to take his vacation days and sick days prior to obtaining personal leave for his father's death. It was left open as to how much time, in addition to bereavement days, Jordan would be able to use after his father passed away.
 
 
 10
 On May 11, 1992, shortly before the end of his one-month probation period, Jordan informed Linda Larsen, Director of the Corporate Information Center, that he would take several days off to spend time with his ailing father. Larsen requested that Jordan call Porter in a few days to let her know how many days he intended to be out of the office.
 
 
 11
 By May 13, Jordan had not called in. Larsen called Jordan that morning and asked him to return to work because his co-worker, Arlene Arp, had left for a long-planned vacation. Jordan came in the next day, but left shortly after arriving when informed that his father had died that morning. Jordan commenced three days of bereavement leave, which is provided for in Kearney's written policy. After the three days of bereavement leave, Jordan took one additional day of personal leave, but was not allowed to take additional time off by using vacation days. Another Kearney employee, Vera Thompson, was allowed to take vacation time when her mother was dying of cancer, and Kearney hired a temporary employee to handle her duties while she was gone.[2]
 
 
 12
 Jordan returned to work on May 20, 1992. On May 22, Porter informed Jordan that the term of his probation would be extended until May 27 to make up for the four days of his absence during the period of probation. On May 27, 1992, Jordan, Porter, Larsen, and Merikay Huszagh (Manager of Human Resources) met to review Jordan's performance during the probation period. At that meeting, it was noted that Jordan's performance had not improved.[3] The probation was extended further until June 1.
 
 
 13
 On June 1, 1992, Jordan met with Porter, Larsen, and Huszagh to discuss whether his employment would continue. Prior to the meeting, he was given additional work materials to evaluate his ability to calculate foreign currency conversions into United States currency, a job function Jordan had previously performed. Jordan made errors in several of his calculations, and he was terminated that day.
 
 II. ANALYSIS
 
 14
 The district court granted Kearney summary judgment under Fed.R.Civ.P. 56(c). The court analyzed Jordan's gender discrimination claim under the familiar burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973). The court concluded that Jordan had failed to establish any elements of a prima facie case of gender discrimination. The court further concluded that, even if Jordan had established a prima facie case, Kearney had offered a legitimate, nondiscriminatory reason for firing him, and that Jordan had failed to establish that Kearney's reason was pretextual.
 
 
 15
 We agree with the district court that, even if one were to assume that Jordan could establish a prima facie case, he can not demonstrate a genuine issue of material fact with regard to whether Kearney's stated reason for firing him was pretextual. See Fuka v. Thomson Consumer Elecs., 82 F.3d 1397, 1404 (7th Cir.1996) (eschewing mechanistic application of McDonnell Douglas and proceeding to consider whether plaintiff met her burden of showing pretext). Kearney claims that it fired Jordan for his performance deficiencies, particularly in the areas of accuracy and productivity. Throughout his employment with Kearney, Jordan's performance evaluations consistently reflected below "satisfactory" ratings in the areas of accuracy and productivity. In Jordan's final evaluation, he received "unsatisfactory" ratings in these two categories, and in general, this evaluation indicated a sharp decline in Jordan's overall performance.
 
 
 16
 Jordan himself concedes a "negative trend" in his final performance evaluation. Nevertheless, he argues that Kearney's reason for firing him was pretextual because (1) although making input errors was a stated reason for his termination, data entry was not a stated job qualification, (2) Porter admitted that others made input errors, but they were not fired, and (3) Porter discussed errors with others but not Jordan.
 
 
 17
 First, although the term "data entry" does not appear on the job description as a qualification for Jordan's position, it is clear that data entry is a part of the job. The job description for a "Resources Specialist" includes the following specific duties:
 
 
 18
 1. Provides information research services for the consultants worldwide by accessing and retrieving internally generated data via the engagement/client computer program.
 
 
 19
 2. Controls the sas[4] input of new engagements, add-on's, and budget revision data.
 
 
 20
 3. Controls the oracle input and coding of new engagements, add-on's and budget revision data, as needed.
 
 
 21
 R.Doc. 30, Exh. 3. Second, although Porter admitted that others made errors in data entry, she never stated that their errors were as serious as Jordan's. Finally, Jordan notes that Porter discussed accuracy problems with others but not Jordan. If anything, the fact that Porter talked to others about problems with their accuracy suggests that she took the matter of accuracy seriously, not that it was a pretext for firing Jordan. In any case, there is no question that Porter informed Jordan (through his first two evaluations) that he was having problems with accuracy in his work, so whether she told him face-to-face is irrelevant. Thus, we conclude that Jordan has failed to establish that Kearney's reason for firing him was pretextual.
 
 
 22
 Because Jordan has failed to raise a genuine issue of material fact regarding whether Kearney's reason for firing him was pretextual, we affirm the district court's grant of summary judgment. Fuka, 82 F.3d at 1406-07.
 
 Rule 38 Sanctions
 
 23
 Kearney has filed a separate motion with this court for sanctions pursuant to Rule 38 of the Federal Rules of Appellate Procedure.[5] We have determined that sanctions under Rule 38 are appropriate " 'when the result is obvious or when the appellant's argument is wholly without merit.' " Ashkin v. Time Warner Cable Corp., 52 F.3d 140, 146 (7th Cir.1995) (quoting Flaherty v. Gas Research Inst., 31 F.3d 451, 459 (7th Cir.1994)).
 
 
 24
 Kearney argues that sanctions are justified in this case because Jordan's appeal was less meritorious than the appeals in Ashkin and Rennie v. Dalton, 3 F.3d 1100 (7th Cir.1993), cert. denied, 114 S.Ct. 1054 (1994), both cases in which this court determined that sanctions were appropriate. We disagree. In Ashkin and Rennie, the court determined that sanctions were justified because the plaintiffs in those cases could have prevailed on appeal only if they convinced the court that the district court's credibility determinations were wrong, a virtually impossible task. See Ashkin, 52 F.3d at 146; Rennie, 3 F.3d at 1110. In the present case, Jordan has not asked this court to reverse any credibility determinations by Judge Marovich.
 
 
 25
 Kearney also maintains that sanctions are appropriate because Jordan fails to address the reasons given by the district court for granting summary judgment. Kearney complains that on appeal Jordan reiterates the arguments he made before the district court. However, because this court reviews a district court's grant of summary judgment de novo, it is not sanctionable for an appellant to advance on appeal the same arguments that he or she advanced in the district court. Having considered Jordan's submissions to this court, we conclude that, although his appeal had very little merit, it was not wholly without merit. Accordingly, we will deny the motions for sanctions.
 
 III. CONCLUSION
 
 26
 The judgment of the district court is AFFIRMED. Appellee A.T. Kearney's motion for sanctions is DENIED.
 
 
 
 [1]
 In addition, Kearney's job description states that a Resources Specialist "is responsible for providing client/engagement research services for the consulting staff worldwide. Maintains the engagement and client records data and internal corporate documents in proper order. Performs administrative duties of the department. Carries out special assignments, as needed." (Def's 12(m) Exh. 6)
 
 
 [2]
 Although Jordan provides no citation to the record to support his claim concerning the treatment of Thompson (Appellant Br. 15, 17-18), Kearney does not seem to dispute Jordan's version of the facts
 
 
 [3]
 In his Rule 12(n) response, Jordan disputes the statement that his performance had not improved, but he merely cites a portion of his deposition where he states that he was never shown the errors. See Jordan Dep. 21. This is insufficient to dispute that his performance failed to improve
 
 
 [4]
 This refers to a database containing a broad array of information concerning Kearney's clients and the previous work that Kearney had performed for them
 
 
 [5]
 Fed.R.App.P. 38 provides:
 If a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee.